USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/25/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
VALERIO RODRIGUEZ,                          :
                                            :
                    Plaintiff,              :
                                            :          **OPINION AND ORDER**
          -against-                         :
                                            :          19-CV-9066 (JLC)
ANDREW SAUL,                                :
COMMISSIONER OF SOCIAL SECURITY,            :
                                            :
                    Defendant.              :
                                            :
------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Valerio Rodriguez seeks judicial review of a final determination by

defendant Andrew M. Saul, the Commissioner of the Social Security

Administration, denying Rodriguez's application for disability insurance benefits

under the Social Security Act.  The parties have cross-moved for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the

reasons set forth below, Rodriguez's motion is granted and the Commissioner's

cross-motion is denied.

## I.  BACKGROUND

### A.  Procedural Background

Rodriguez filed for Social Security Disability Insurance Benefits ("DIB") on

September 20, 2016, alleging a disability onset date of February 10, 2016.  *See*

Administrative Record ("AR"), Dkt. No. 11, at 81, 165–73.[1] He alleged that he had a
"left ankle impairment" and a "back impairment." *Id.* at 80. The Social Security
Administration ("SSA") denied Rodriguez's claim on December 22, 2016. *Id.* at 94–
104. On January 20, 2017, Rodriguez requested a hearing before an Administrative
Law Judge ("ALJ") and, on July 25, 2018, he appeared before ALJ Miriam L. Shire
in the Bronx. *Id.* at 42–78, 106–07. ALJ Shire subsequently issued a decision dated
November 5, 2018, in which she found that Rodriguez was not disabled. *Id.* at 20–
30. On that same day, a Notice of Decision with a copy of the decision was sent to
Rodriguez. *Id.* at 17–30. Rodriguez sought review of the ALJ's decision through the
Appeals Council, which was subsequently denied on August 5, 2019, rendering the
ALJ's decision final. *Id.* at 11–16.

      Rodriguez timely commenced the present action on September 30, 2019,
seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C.
§ 405(g). Complaint, Dkt. No. 1. The Commissioner answered Rodriguez's
complaint by filing the administrative record on January 13, 2020. AR, Dkt. No. 11.
The parties consented to my jurisdiction on November 13, 2019. Dkt. No. 10.
Thereafter, on March 13, 2020, Rodriguez moved for judgment on the pleadings
seeking a remand for further administrative proceedings and submitted a
memorandum of law in support of his motion. Notice of Motion, Dkt. No. 12;
Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment on

---

[1] The page numbers refer to the sequential numbering of the Administrative Record
provided on the bottom right corner of the page, not the numbers produced by the
Electronic Case Filing System.

the Pleadings ("Pl. Mem."), Dkt. No. 13.  The Commissioner cross-moved for

judgment on the pleadings on June 3, 2020 and submitted a memorandum in

support of his cross-motion.  Notice of Cross-Motion, Dkt. No. 16; Memorandum of

Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in

Support of the Commissioner's Cross-Motion for Judgment on the Pleadings ("Def.

Mem."), Dkt. No. 17.  On June 17, 2020, Rodriguez advised the Court that he would

not submit reply papers.  Dkt. No. 18.

## B. The Administrative Record

### 1. Rodriguez's Background

Rodriguez was born on May 10, 1972.  AR at 167.  He was 43 years old on his

alleged onset date of disability (February 10, 2016).  *Id.* at 20.  At the time of his

hearing before ALJ Shire, Rodriguez lived with his fiancée and her 19-year-old son

in the Bronx.  *Id.* at 1, 61.  He completed high school and some college.  *Id.* at 45.

Rodriguez had worked as a detective at the New York City Police Department since

2001.  Following a work accident on October 7, 2014, Rodriguez was placed on

administrative duty at the NYPD for eight months before he retired due to his

impairments.  *Id.* at 49, 51–53.

### 2. Relevant Medical Evidence

#### a. Treatment History

##### i. Anthony Frempong-Boadu, M.D.—Surgeon

Anthony Frempong-Boadu, M.D., is Rodriguez's surgeon at NYU Langone

Health System.  *Id.* at 320–24.  During an office visit on February 8, 2016,

Rodriguez reported unremitting pain in his lower back and right lower extremity. *Id.* at 332.  Examination results from that visit reflect full upper and lower extremity strength, but low scores of 0+/4 for his right and left patellar and left Achilles and 1+/4 for the rest of his reflexes as well as a positive straight leg raise test.  *Id.* at 331.  Dr. Boadu reported mild bilateral foraminal stenosis and "disc herniation causing central canal stenosis and severe right foraminal stenosis with impingement of exiting right L5 nerve root."  *Id.* at 332.  In light of these findings, Dr. Boadu scheduled surgery for February 22, 2016.  *Id.* at 332.

On February 22, 2016, Rodriguez complained of low back pain, intermittent pain in his buttocks and that radiated down his right thigh, neck pain, and intermittent numbness in both hands.  *Id.* at 329.  He also reported that the pain worsens with bending, forward flexion, extension as well as prolonged sitting, standing, and walking.  *Id.*  As a result, he can only walk for four blocks before needing a break, and cannot tie his own shoes or get his socks on without significant pain, although he denies weakness of his legs.  *Id.*  After a pre-operation consultation with Dr. Baodu, Rodriguez underwent a posterior lumbar laminectomy and fusion of L4-S1 and a transforaminal lumbar interbody fusion (TLIF) of L5-S1. *Id.* at 320–24, 329.[2]

---

[2] "Laminectomy is a type of surgery in which a surgeon removes part or all of the vertebral bone (lamina). This helps ease pressure on the spinal cord or the nerve roots that may be caused by injury, herniated disk, narrowing of the canal (spinal stenosis), or tumors. A laminectomy is considered only after other medical treatments have not worked." *Laminectomy*, John Hopkins Medicine, available at https://www.hopkinsmedicine.org/health/treatment-tests-and-

At a post-surgery follow-up appointment on April 5, 2016, Rodriguez presented with routine postoperative complaints and "a diminution in his preoperative symptoms." *Id.* at 601. Dr. Baodu referred him to physical therapy for stretching and muscle strengthening as he begins a "gradual return to full normal level of activity." *Id.* Rodriguez was directed to return for a follow-up appointment in approximately 10 weeks.

At Rodriguez's next visit on October 12, 2017, Dr. Baodu reported that he was making progress in his recovery and was "without any significant complaints referable to their [sic] surgery." *Id.* at 519. He noted that Rodriguez had "restarted physical training program including running, gym workouts, and swimming" and has had "marked resolution of his preoperative symptomatic complaints with only occasional soreness" such that there is "no restriction on his activity . . . secondary to his spine." *Id.* Dr. Baodu recommended that Rodriguez return for a follow-up visit in three months. *Id.* The record does not contain any other treatment notes from Dr. Boadu after this October 2017 appointment.

---

therapies/laminectomy#:~:text=Laminectomy%20is%20a%20type%20of,spinal%20stenosis)%2C%20or%20tumors (last visited on Feb. 24, 2021).

"A Transforaminal Interbody Lumbar Fusion treats spinal instability or weakness by permanently uniting bones of the lumbar (lower) spine. The goals of a TLIF are to decompress (remove the pressure from) the spinal cord and/or nerves, re-stabilize the spine, and prevent further movement and degeneration at the joints in question." *Transforaminal Lumbar Interbody Fusion (TLIF)*, The Spine Hospital At The Neurological Institute of New York, available at https://www.columbiaspine.org/treatments/transforaminal-lumbar-interbody-fusion-tlif/ (last visited on Feb. 24, 2021).

### ii.    Sireen Gopal, M.D.—Physical Therapist

Sireen Gopal, a doctor at New York Spine and Sport, Rehabilitation
Medicine, P.C. treated Rodriguez and administered physical therapy approximately
two to three times a week from April 2016 through June 2017, and sporadic
treatment between December 2017 through June 2018.  During his initial visit on
April 12, 2016, Rodriguez complained of lower back pain, which he rated an eight
out of ten, noting that the pain is aggravated when standing and walking.  *Id.* at
451.  Rodriguez received physical therapy and was instructed to follow-up two to
three days later.  *Id.* at 451–52.  During his next visit on April 14, 2016, Rodriguez
reported the same complaints and Dr. Gopal noted that he had back pain and a
decreased range of motion with score of 3-/5 in abdominal motor strength.  *Id.* at
450.  Dr. Gopal administered physical therapy and noted that Rodriguez tolerated
the treatment with pain but completed all exercises.  *Id.*  Rodriguez had similar
limitations and symptoms throughout April.  *See, e.g., id.* at 680 (complaints of low
back pain affecting his ability to walk and stand on April 20, 2016), 678 (moderate
back stiffness on April 22, 2016).  By the end of April and through May, Rodriguez's
pain, mobility, and stiffness were generally improving with therapy.  *See, e.g.*, *id.* at
665, 667, 669, 671, 677.

During a May 25, 2016 appointment, Rodriguez stated that his strength and
stiffness was improving and he was "able to do some exercises at the gym."  *Id.* at
440.  At a subsequent follow-up visit on June 2, 2016, Rodriguez reported that his
back pain and strength were improving with therapy and Dr. Gopal found his

strength to be "[f]air" as he was "able to perform side-planks with difficulty and effort." *Id.* at 439.  His symptoms improved throughout June 2016.  *See, e.g.*, *id.* at 660 (low back pain easing on June 7, 2016), 658 (reports of less pain on June 9, 2016), 656 (lower back stiffness getting better on June 14, 2016).  He again complained of symptoms in early July but towards the end of the month he showed improvement.  *Id.* at 654 (Rodriguez reporting stiffness at July 6, 2016 visit), 652 (Rodriguez reporting right hip pain and stiffness at July 13, 2016 visit), 650 (July 19, 2016 notes stating lower back stiffness improving), 648 (July 21, 2016 improving lower extremity strength with better stability).  His motor strength also began to improve during this time and he scored between 4- and 4 out of 5 in abdominal, lumbar spine, and right hip strength.  *Id.* at 433–38.  Based on progress notes from a July 26, 2016 visit, Rodriguez's strength and stability of his lower back had improved and, upon examination, he had no sensory deficits and a negative straight leg raise.  *Id.* at 431.  By July 28, 2016, Rodriguez reported feeling stronger and Dr. Gopal rated his lower back stability "fair+" as he was "able to maintain push-up position with some effort" and he tolerated physical therapy treatment "without pain or discomfort."  *Id.* at 430.

Rodriguez continued to "feel[] better with therapy" at his subsequent appointments.  *Id.* at 429; *see id.* at 428.  On August 12, 2016, Dr. Gopal assessed intermittent pain on a scale of five out of ten and noted decreased lumbar range of motion with pain on extremes of motion.  *Id.* at 426.  Approximately one month later, Rodriguez reported severe pain and tightness in his lower extremities, and,

upon examination, Dr. Gopal confirmed severe muscle tightness but found a normal lumbar range of motion with motor strength of 4+/5. *Id.* at 425. By the end of September 2016, Rodriguez was "able to perform gym workouts with less discomfort" and his "overall symptoms [were] improving with therapy," including his lumbar spine range of motion, although he still complained of "pain and mild difficulty while bending forward." *Id.* at 423–24. He reported lower back and leg weakness at his follow-up visit on October 4, 2016. *Id.* at 420. During his October 6, 2016 visit, his last appointment of 2016, Rodriguez only complained of "soreness on back" but otherwise stated he felt better. *Id.* at 419.

Rodriguez returned for physical therapy treatment on May 17, 2017 with the same complaints of pain in his lower back. *Id.* at 629. He rated the severity of pain a six out of ten at that time and reported that it "[t]akes [him] about 2-3 minutes to rise from [a] seated position." *Id.* A straight leg raise administered during the visit was negative. *Id.* Dr. Gopal's progress notes reflect that Rodriguez's lower back pain and stability improved with therapy over the next several weeks; however, at a June 8, 2017 appointment, Rodriguez again complained of constant lower back pain. *Id.* at 624–628.

His next appointment took place on December 15, 2017. *Id.* at 622. During that visit, Rodriguez reported sharp, aching pain in his lower back that was aggravated by prolonged standing, walking, and sitting. *Id.* at 622. Dr. Gopal assessed motor strength of 3+ out of 5 in his abdominals and lumbar spine. *Id.* at 622. At the subsequent appointment, Rodriguez reported "lower back pain felt

following static postures" and, by the end of December 2017, he experienced "mild lower back pain with greater weakness present" but was able to go to the gym. *Id.* at 618, 620. On January 31, 2018, he reported being "unable to go to the gym due to pain and stiffness in [his] lower back and legs." *Id.* at 616. On May 2, 2018, Rodriguez complained of lower back pain that radiates into his left leg and is aggravated by prolonged sitting (more than 30 minutes) and walking (more than one block). *Id.* at 613. He rated the pain a nine out of ten at its worst, but a three to four out of ten when he uses heat and medicine. *Id.* Dr. Gopal assessed functional limitations as a result of these symptoms and found that Rodriguez was unable to walk more than a block, sit more than ten minutes, or participate in sports or games due to his pain. *Id.* at 614. Rodriguez experienced continued pain and stiffness in his lower back and received motor strength scores ranging from 3-/5 to 4-/5 on subsequent follow-up visits throughout May 2018. *See, e.g., id.* at 608, 610, 611. By June 2018, Rodriguez complained of mild left shoulder pain and worsening lower back pain with difficulty "turning and twisting to either side due to pain and stiffness." *Id.* at 772. Dr. Gopal noted that his lumbar range of motion was limited due to pain and stiffness, and assigned abdominal and lumbar paraspinal motor strength scores of 3-/5 and 4-/5, respectively. *Id.* at 771–72.

### iii.    Justin Greisberg, M.D.

Justin Greisberg, M.D., treated Rodriguez for his left Achilles injury from April 2014 through at least November 26, 2014. On April 17, 2014, Greisberg performed a left Achilles tendon repair on Rodriguez. *Id.* at 285–86. At follow-up visits on April 30 and May 28, 2014, Greisberg reported that Rodriguez was doing

well and that he had been improving since the surgery. *Id.* at 278, 282. On June 25, 2014, Greisberg observed that Rodriguez's recovery was "going a bit slow" but that he was "doing okay overall." *Id.* at 274. On November 26, 2014, approximately seven months after the surgery, Rodriguez had another office visit and reported soreness in his ankle with "some intermittent plantar fascia symptoms," and that his strength was improving, but not normal. *Id.* at 260. Greisberg performed a physical examination and found some thickening in his Achilles tendon, but assessed no tenderness and the appropriate tension. *Id.* He also found "some strength" in his Achilles and concluded that Rodriguez was "making slow but steady progress." *Id.* Greisberg recommended that he continue his physical therapy routine and stay on limited duty at work until his next appointment. *Id.* at 260.

### iv. Stuart Saftchick, M.D.

Stuart Saftchick, M.D., treated Rodriguez for his back and shoulder impairment from at least April 2017 through July 2018. *Id.* at 199–200, *see, e.g., id.* at 739, 741, 746, 749–51, 765, 855–58; 860–865. He ordered MRIs of Rodriguez's spine and shoulder from University Diagnostic Medical Imagining, P.C. *Id.* at 860–62. The MRI results of his lumbar spine, dated June 26, 2017, established mild right foraminal narrowing at L4-L5 and a "posterior scar in the surgical bed [that] appears to encroach on the thecal sac or spinal canal [with u]nderlying disc bulging." *Id.* at 862–63. With respect to results from an MRI of Rodriguez's left shoulder on June 8, 2018, Rodriguez had "thickening of the supraspinatus tendon in association with linear signal suggestive of tendinosis." *Id.* at 861. Finally, results

of his MRI scan of his cervical spine, dated July 13, 2018, established "mild to moderate multilevel degenerative changes." *Id.* at 860.

### b. Opinion Evidence

### i. Sharon Revan, M.D.—Internal Medicine

Dr. Revan administered an internal medicine examination on December 13, 2016. *Id.* at 414–16.  During the examination, claimant reported "neck and low[er] back pain since a motor vehicle accident in October 2014" and continuing symptoms since his surgery, including "intermittent sharp pain, better with meds and stretching, worse with changing positions, sitting or standing for long, climbing stairs, lying down, and sneezing." *Id.* at 414.  He denied radiation of pain and rated his pain a seven out of ten. *Id.*  Rodriguez claimed that he could shower and dress himself, but that he could not put on his shoes and socks due to his back pain and his fiancée cooks, cleans, does the laundry, and shops because he cannot lift anything heavy. *Id.*  Dr. Revan assessed no acute distress and a normal gait, but noted that Rodriguez was "[u]nable to walk on his toes," "[w]alks very little on his heels," and "squats one-quarter of the way holding on." *Id.* at 415.  Dr. Revan also observed that Rodriguez's stance was normal, he did not use an assistive device, rose from the chair without difficulty, and needed no help to change for the exam or to get on and off the examination table. *Id.*  With respect to the musculoskeletal test, Dr. Revan found a positive straight leg raise (seated), lower back pain, pain in lumbar spine with lateral flexion, and pain with range of motion of his hips, but he maintained a full range of motion and full strength in his upper and lower

extremities. *Id.* at 415–16.  Dr. Revan did not observe any muscle atrophy. *Id.* at 416.  Rodriguez was diagnosed with neck and lower back pain and received a "fair" prognosis. *Id.*  Dr. Revan opined that Rodriguez had "no limitation with upper extremities for fine and gross motor activity, mild to moderate limitation with sitting, standing, lying down, and climbing stairs due to his back pain . . . [and m]ild to moderate limitation with personal grooming and activities of daily living due to back pain." *Id.*

### ii.    Stuart Saftchick, M.D.

Dr. Saftchick evaluated Rodriguez on July 11, 2018 and completed a Medical Source Statement. *Id.* at 855–58.[3]  During the examination, Rodriguez complained of neck pain that radiated through his left arm to his left hand that limited his ability to lift, carry, hold a cup, reach over 90 degrees, turn his head to the left side, grasp objects from floor, squat and pull a door. *Id.* at 857.  Dr. Saftchick noted that Rodriguez could lift or carry up to 10 pounds frequently and 20 pounds occasionally, but could never lift or carry more than 25 pounds. *Id.* at 855–56.  He also found that Rodriguez could stand and walk for up to 20 minutes, after which time he would need to take a break and stretch for a few minutes. *Id.* at 855.  Moreover, he opined that Rodriguez could only sit for 20 minutes and noted that, even while resting, his left arm constantly tingled. *Id.* at 856.  Rodriguez's impairment also limited his ability to push or pull with his upper extremities. *Id.*  Dr. Saftchick

---

[3] The Medical Source Statement is also signed by a physical therapist from N.Y. Spine & Sports Rehabilitation, P.C.; however, the name of the therapist is illegible. *Id.* at 858.

12

found that Rodriguez could frequently climb, balance, kneel, crouch, crawl, stoop, reach and finger, and could constantly handle and feel objects.  *Id.* at 856–57.  He also opined that Rodriguez's ability to maintain attention and concentration throughout an 8-hour workday was significantly compromised.  *Id.* at 857.

### iii.   Anthony Frempong-Boadu, M.D.—Physical Therapist

On October 12, 2017, Dr. Boadu opined that Rodriguez "has had marked resolution of his preoperative symptomatic complaints with only occasional soreness" and that "[t]here is no restriction on his activity at this point [in] time secondary to his spine."  *Id.* at 519.  Dr. Boadu also reported that no intervention would be needed "[i]f he continues [to be] fully active without any complaints of mechanical back pain or any functional decline."  *Id.*

### iv.   Orsuville Cabatu, M.D.—Physical Medicine and Rehabilitation

Physical medicine and rehabilitation doctor Orsuville Cabatu, M.D., treated Rodriguez for his injuries following his work accident in October 2014.  Dr. Cabatu's most recent evaluation dated January 7, 2016, one month before the alleged disability onset date, noted limited range of motion of Rodriguez's cervical and lumber spine with pain.  *Id.* at 354.  Dr. Cabatu recommended no pulling or pushing, and no lifting more than 15 pounds.  *Id.* at 355.  He also concluded that Rodriguez was "50% partially disabled."  *Id.*

### 3.  ALJ Hearing

Represented by counsel, Rodriguez appeared at the hearing before ALJ Spire on July 25, 2018.  *Id.* at 44.  Vocational expert, Mary D. Anderson, attended by

13

phone. *Id.* Rodriguez testified that he started working as an NYPD detective in 2001. *Id.* at 45–46. In October 2014, he was involved in a car accident and received treatment for his injuries at St. Luke's Hospital. *Id.* at 49–50. Rodriguez was prescribed ibuprofen, painkillers (Ketorolac), and muscle relaxers (Cyclobensaprine), and was subsequently placed on administrative duty. *Id.* at 51–52, 59. While on administrative duty, Rodriguez was able to sit, stand, and take breaks as often as he needed, but he was in a significant amount of pain. *Id.* at 52. During this time, the NYPD still required Rodriguez to be present for various training and, in part, to participate, including shooting a gun. *Id.* at 54–55. Rodriguez testified that merely standing at the firing range was uncomfortable, and holding a firearm caused him pain. *Id.* at 55, 57–58. After eight months on administrative duty, he began receiving his disability pension from the City and the NYPD "retired" him from the force. *Id.* at 53.

In addition to the problems with his back, Rodriguez also testified about a preexisting condition in his left shoulder that began to bother him in or about June of 2018. *Id.* at 56. Rodriguez stated that this impairment causes pain in his neck that radiates to his left arm, and causes numbness from his left arm to his left fingertips. *Id.* at 56–57. He reported at the hearing that these symptoms began "about a few weeks ago" and that he is "in the process of getting that checked out." *Id.* at 56.

Rodriguez testified that he is in pain every day, and rated his pain a seven or eight out of ten without medication and a four or five out of ten with medication.

14

*Id.* at 59.  He testified that he starts to feel pain when he stands for more than 30 minutes or sits between 30 to 45 minutes.  *Id.* at 60, 67.  He also stated that he can only walk four or five blocks before he starts to feel pain in the back, and it worsens the more he walks.  *Id.* at 60.  He testified that he has to rotate every 30 minutes between sitting, standing, and walking, and he uses an assistive device every day but is able to walk on his own.  *Id.* at 60, 68–69, 71.

With respect to his daily activities, Rodriguez reported that his fiancée and her son do most of the household work, take out the garbage, assist with groceries, and clean the house.  *Id.* at 61.  His fiancée washes the clothes and, at times, he folds some of the clothes.  *Id.* at 62.  He testified that he is unable to go to the movies because he can't sit more than an hour and, if he socializes with friends or goes to the beach, he can only stay out for 45 minutes to an hour otherwise he will get a "sharp pain in [his] back" and need to go home.  *Id.* at 63–64.  He stated that he is unable to work, even at a sedentary job, because he feels too much pain after 30 minutes of sitting down at a desk.  *Id.* at 66.

Mary D. Anderson, a vocational expert, also testified at the hearing.  The ALJ queried whether there would be any sedentary jobs with a sit/stand option every 20 minutes, taking about two minutes each time to maneuver and stretch in between getting up and moving, that involved no pushing or pulling with upper extremities, temperature extremes, excessive humidity, hazardous moving machinery, unprotected heights, crawling, scaffolding, or climbing.  *Id.* at 72–73.  The ALJ also added that the hypothetical person could only occasionally finger, feel, manipulate,

15

or handle with his left non-dominant arm, but never reach overhead with that arm or turn his head to the left or look upwards.  *Id.* at 73.  Anderson identified two types of jobs available given those conditions: election clerk and surveillance system monitor.  *Id.* at 73–76.  Anderson identified 294,922 jobs available as an election clerk, of which only 208,177 that would be year-round election clerk jobs, and 18,454 jobs available as a surveillance system monitor.  *Id.* at 74–75.  Anderson also testified that none of the jobs would be available to an individual who could only occasionally concentrate on the job due to pain.  *Id.* at 76.  She also confirmed that her testimony conformed to the Dictionary of Occupational Titles.  *Id.*

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of Commissioner's Determinations

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides."  42 U.S.C. § 405(g).  The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence.  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("under the

16

substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g). However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal

standard, [the court has], on numerous occasions, remanded to the [Commissioner]
for further development of the evidence."  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir.
1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in
original).

### 2.  Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to
engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which
has lasted or can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  Physical
or mental impairments must be "of such severity that [the claimant] is not only
unable to do his previous work but cannot, considering his age, education, and work
experience, engage in any other kind of substantial gainful work which exists in the
national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet
the statutory definition of disability, the Commissioner "must make a thorough
inquiry into the claimant's condition and must be mindful that 'the Social Security
Act is a remedial statute, to be broadly construed and liberally applied.'"  *Mongeur*,
722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).
Specifically, the Commissioner's decision must take into account factors such as:
"(1) the objective medical facts; (2) diagnoses or medical opinions based on such
facts; (3) subjective evidence of pain or disability testified to by the claimant or

others; and (4) the claimant's educational background, age, and work experience."
*Id.* (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential
evaluation process' to determine whether a claimant is disabled[.]" *Estrella v.
Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R.
§ 404.1520(a)(4).  First, the Commissioner must establish whether the claimant is
presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed,
the Commissioner goes to the second step and determines whether the claimant has
a "severe" impairment restricting her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).
If the claimant has such an impairment, the Commissioner moves to the third step
and considers whether the medical severity of the impairment "meets or equals" a
listing in Appendix One of Subpart P of the regulations.  20 C.F.R.
§ 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *Id.*; 20 C.F.R.
§ 404.1520(d).  If not, the Commissioner continues to the fourth step and
determines whether the claimant has the residual functional capacity ("RFC") to
perform her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the
claimant does not have the RFC to perform past relevant work, the Commissioner
completes the fifth step and ascertains whether the claimant possesses the ability to
perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537
F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the

Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See, e.g.*, *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's

regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See, e.g., Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted).[4] A treating physician's opinion is given controlling weight,

---

[4] Revisions to the applicable regulations in 2017 included modifying 20 C.F.R. § 404.1527 to clarify and add definitions for how to evaluate opinion evidence for claims filed before March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017). Accordingly, this opinion and order applies the regulations that were in effect when Rodriguez's claim was filed with the added clarifications provided in the 2017 revisions.

provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).  The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.  Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded

22

controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to a broader duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this Circuit, the [treating physician] rule is robust."), *adopted by* 2012 WL 6621722 (Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry, the ALJ must consider the so-called "*Burgess* factors" outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence

23

> in support of the treating physician's opinion; (iii) the
> consistency of the opinion with the record as a whole; (iv)
> whether the opinion is from a specialist; and (v) other
> factors brought to the Social Security Administration's
> attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see also Burgess*, 537 F.3d at 129; 20

C.F.R. § 404.1527(c)(2).  This determination is a two-step process.  "First, the ALJ

must decide whether the opinion is entitled to controlling weight."  *Estrella*, 925

F.3d at 95.  Second, if, based on these considerations, the ALJ declines to give

controlling weight to the treating physician's opinion, the ALJ must nonetheless

"comprehensively set forth reasons for the weight" ultimately assigned to the

treating source.  *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133

(responsibility of determining weight to be afforded does not "exempt administrative

decisionmakers from their obligation . . . to explain why a treating physician's

opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R.

§ 404.1527(d)(2)).  If the ALJ decides the opinion is not entitled to controlling

weight, "[a]n ALJ's failure to 'explicitly' apply these '*Burgess* factors' when

[ultimately] assigning weight at step two is a procedural error."  *Estrella*, 925 F.3d

at 96 (quoting *Selian*, 708 F.3d at 419–20).  The regulations require that the SSA

"always give good reasons in [its] notice of determination or decision for the weight"

given to the treating physician.  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d

Cir. 1998) (alteration in original) (citations omitted).  Indeed, "[c]ourts have not

hesitate[d] to remand [cases] when the Commissioner has not provided good

reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d

at 33) (second and third alteration in original) (internal quotation marks omitted).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to

deference by a reviewing court. *See, e.g.*, *Osorio v. Barnhart*, No. 04-CV-7515

(DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of

fact, '[i]f the Secretary's findings are supported by substantial evidence, the court

must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.*

(quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir.

1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient

specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL

5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859

F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility]

determination 'in light of the objective medical evidence and other evidence

regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*,

750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other

symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d

Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-

step framework for evaluating allegations of pain and other limitations. *Id.* First,

the ALJ considers whether the claimant suffers from a "medically determinable

impairment that could reasonably be expected to produce" the symptoms alleged.

25

*Id.* (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record."  *Id.* (citing 20 C.F.R. § 404.1529(a)).  Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

## B. The ALJ's Decision

In her November 5, 2018 decision, the ALJ concluded that Rodriguez was not disabled as defined by the Social Security Act.  AR at 30.  Following the five-step inquiry, at step one the ALJ found that Rodriguez had not been engaged in substantial gainful activity since February 10, 2016, the alleged onset date of Rodriguez's impairments.  AR at 22.  At step two, the ALJ found that Rodriguez had

the following severe impairments: lumbar degenerative disc disease (status post fusion), left shoulder arthropathy, cervical degenerative disc disease, and obesity. *Id.* at 22–23.

At step three, the ALJ found that none of Rodriguez's impairments, singly or in combination, met or equaled the medical severity in Listings 1.04 or 1.02B in Appendix One of Subpart P of the regulations.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04.  *Id.* at 23.  With respect to Listing 1.04, the ALJ found that there was no evidence to meet the requirements set forth under Paragraphs A, B, or C.  Of particular relevance, the ALJ found that Rodriguez did not qualify for Paragraph A of Listing 1.04 because there was "no evidence of sensory or reflex loss, or nerve root compression."  *Id.*  The ALJ also found no evidence of spinal arachnoiditis as required under Paragraph B, nor any evidence that demonstrated that Rodriguez required two crutches or a walker to ambulate as required under Paragraph C.  *Id.* at 23–24.  Moreover, the ALJ determined that the "precise criteria of [Listing 1.02B] ha[d] not been met" as Rodriguez had "no limitations at all in his dominant right arm."  *Id.* at 24.

Prior to evaluating step four, the ALJ determined Rodriguez's RFC as follows:

> [Rodriguez can] perform sedentary work as defined in 20 CFR 404.1567(a) except that claimant would need a sit/stand option every 20 minutes taking about two minutes to change position, cannot push or pull with the upper extremities, and can tolerate no exposure to temperature extremes, excessive humidity, hazardous moving machinery, or unprotected heights.  The claimant can never crawl, no scaffolding, and no climbing.  With the left non-dominant upper extremity, the claimant cannot reach overhead, can only

27

occasionally finger, feel, and handle, no turning of the head to the left side, and no looking upward with the neck/head.

*Id.* at 24.  In formulating this RFC, the ALJ evaluated Rodriguez's allegations and testimony and concluded that his "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence." *Id.* at 25.  Specifically, the ALJ found that after his spine surgery, Rodriguez's functional capacity had "substantially improved" and he had "repeatedly informed his physical therapist and treating physician that his symptoms were improved, allowing him to regularly go to the gym for workouts." *Id.* at 27.  The ALJ also noted that there were "large gaps in the record with no evidence that the claimant sought any treatment for his impairments" and no evidence that Rodriguez sought other treatment for his pain besides physical therapy and pain medications.  *Id.*  Moreover, the ALJ found that his treating medical providers did not indicate he needed additional surgery.  *Id.*  The ALJ also concluded that Rodriguez did not require the use of any ambulatory assistive device. *Id.*

Next, the ALJ summarized Rodriguez's treatment history and weighed the opinions of medical sources to reach her RFC finding.  *Id.* at 28–29.  The ALJ assigned "great weight" to the portion of Dr. Saftchick's opinion that found Rodriguez could lift and carry 20 pounds occasionally and 10 pounds frequently, stand/walk and sit for 20 minutes at a time, and frequently climb, balance, kneel, crouch, crawl, stoop, reach, and finger, but should avoid operating heavy machinery, which was "generally consistent with the claimant's treatment notes which

28

document that his functionality significantly improved after his lumbar fusion." *Id.* at 28.  However, the ALJ assigned "little weight" to Dr. Saftchick's opinion that Rodriguez's "ability to maintain attention and concentration on work tasks would be significantly compromised" because this conclusion was inconsistent with Dr. Revan's exam notes, which had indicated that Rodriguez "had full range of motion in his upper and lower extremities, no sensory deficits, equal and physiologic deep tendon reflexes, intact hand and finger dexterity, and 5/5 grip strength bilaterally"; the MRI results which demonstrated no evidence of nerve root impingement or spinal stenosis since his lumbar fusion; and Rodriguez's statements that "he was able to workout at the gym due to the improvement in his symptoms." *Id.* at 28.

The ALJ assigned "great weight" to Dr. Cabatu's opinion as to Rodriguez's ability to "work limited duty with no lifting more than 15 pounds, and no pushing or pulling," and "partial weight" to Dr. Boadu's opinion that Rodriguez "had no restriction of his activity . . . secondary to his spine." *Id.*  According to the ALJ, both of these opinions were consistent with the record as a whole and, in particular, Dr. Revan's exam notes, the MRI results, and Rodriguez's statements about his ability to work out. *Id.* at 28–29.  However, the ALJ found that the record established that Rodriguez was more limited than Dr. Boadu's findings suggested and that a sedentary residual functional capacity was appropriate for Rodriguez. *Id.* at 29.

Finally, the ALJ afforded only "partial weight" to Dr. Revan's opinion that Rodriguez "had mild to moderate limitation with sitting, standing, lying down and climbing stairs" to the extent it is consistent with his residual functional capacity,

but declined to assign greater weight because "Dr. Revan failed to specifically quantify [Rodriguez's] exertional capacity using policy defined terms." *Id.* at 28.

At step four, the ALJ found that Rodriguez was unable to perform any past relevant work. *Id.* at 29. At step five, after considering the testimony of the vocational expert and Rodriguez's demographic information, the ALJ concluded that there were jobs that exist in significant numbers that he could perform, such as election clerk and surveillance systems monitor. *Id.* at 30. Accordingly, the ALJ concluded that Rodriguez was not disabled from February 10, 2016 through the date of her decision. *Id.*

## C. Analysis

Rodriguez contends that this case should be remanded for three reasons: (1) the ALJ failed to address an alleged severe impairment in his left Achilles (Pl. Mem. at 9); (2) the ALJ failed to properly evaluate evidence in determining that his impairments did not meet Listing 1.04(A) (*id.* at 10); and (3) the ALJ improperly relied on the testimony of a vocational expert concerning available jobs in the economy, which, Rodriguez argues, was inconsistent with the Department of Transportation and the Bureau of Labor Statistics (*id.* at 10–11). The Commissioner counters that the ALJ's decision is supported by substantial evidence at each step of the five-step analysis, and that there are no inconsistencies between the vocational expert's testimony and other agencies. Def. Mem. at 13–21.

### 1. The ALJ Failed to Consider Rodriguez's Ankle Impairment at Step Two and the Error Was Not Harmless

Rodriguez contends that the ALJ erred by failing to consider his Achilles impairment as a severe condition because this impairment was not listed or addressed in her decision.  Pl. Mem. at 9.  In response, the Commissioner contends that there is substantial evidence to establish that Rodriguez's Achilles injury was not severe.  Def. Mem. at 13.  According to the Commissioner, the record demonstrated that Rodriguez "underwent successful surgery to repair the tear" in his Achilles tendon in April 2014 and that there was no evidence to suggest "any significant work-related limitations during the relevant period."  *Id.* at 13–14.

At step two, "[t]he Commissioner must consider 'the combined effect of all of the [plaintiff's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity' to establish plaintiff's eligibility for [social security] benefits."  *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 184 (E.D.N.Y. 2011) (quoting *Burgin v. Astrue,* 348 F. App'x 646, 647 (2d Cir. 2009)).  "The failure to address a condition at step two will constitute harmless error, and therefore not warrant remand, if, after identifying other severe impairments, the ALJ considers the excluded conditions or symptoms in the subsequent steps and determines that they do not significantly limit the plaintiff's ability to perform basic work."  *Eralte v. Colvin*, No. 14-CV-1745 (JCF), 2014 WL 7330441, at *10 (S.D.N.Y. Dec. 23, 2014) (citing *Reices–Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013)); .  "[W]hen functional effects of impairments . . . are [] fully considered and factored into subsequent residual functional capacity assessments, a reviewing court can

31

confidently conclude that the same result would have been reached absent the error." *Poles v. Berryhill*, No. 17-CV-6189 (MAT), 2018 WL 1471884, at *3 (W.D.N.Y. Mar. 26, 2018) (quoting *Snyder v. Colvin*, No. 5:13-CV-585 (GLS) (ESH), 2014 WL 3107962, at *5 (N.D.N.Y. July 8, 2014)).

In his application for social security benefits, Rodriguez identified a "left ankle impairment" as a condition supporting his disability, and raised this impairment again in a letter brief submitted to ALJ Shire on July 18, 2018. *See* AR at 80, 243; *see also id.* at 48 (referring to foot surgery during hearing). The ALJ, however, failed to consider his left ankle impairment at step two of the five-step analysis.

According to the Commissioner, the evidence establishes that Rodriguez's Achilles impairment is not severe and therefore the ALJ did not err at step two. Def. Mem. at 13–14. However, "[r]egardless of whether an impairment qualifies as severe or nonsevere at step two, an ALJ still must consider the impact of all of a claimant's medically determinable impairments when assessing a claimant's RFC." *Boudreau o/b/o Boudreau v. Comm'r*, No. 18-CV-6681 (MWP), 2020 WL 1501752, at *4 (W.D.N.Y. Mar. 30, 2020) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)). On this point, the Commissioner argues that the ALJ identified other severe conditions at step two and then properly "considered and addressed [any work-related impairments resulting from the left Achilles impairment] in [her] RFC

finding." Def. Mem. at 14.[5] "Although such an error would be considered harmless had the ALJ included [Rodriguez's left ankle] impairment throughout the remaining sequential steps of the disability analysis . . . , such is not the case here." *Harper v. Berryhill*, No. 16-CV-0229V(F), 2018 WL 3353070, at *4 (W.D.N.Y. May 23, 2018) (citing *Reices-Colon*, 523 F. App'x at 798), *adopted by* 2018 WL 3349250 (July 9, 2018).[6] The ALJ's decision is devoid of any discussion about Rodriguez's left ankle at any stage of the analysis. While the ALJ certainly considered limitations in his lower extremities, that analysis appears to be in connection with Rodriguez's back, neck, and shoulder impairments. *See, e.g.*, AR at 25 ("Regarding the claimant's back, neck and left shoulder pain, the objective medical evidence does not support the claimant's allegations regarding the severity and intensity of his symptoms."); *id.* at 26 (ALJ noting Rodriguez "had improving lower extremity strength" and citing Dr. Gopal's report prepared in connection with an examination

---

[5] The Commissioner also claims that Rodriguez's left Achilles impairment was a non-severe disability as there was no evidence that "he had significant work-related limitation during the relevant period" as a result. Def. Mem. at 14. However, nothing in the ALJ's decision suggests that she considered the left Achilles impairment at step two. Accordingly, the Court rejects this argument. *See Snell*, 177 F.3d at 134 ("It is well-established that a reviewing court 'may not accept appellate counsel's post hoc rationalizations for agency action.'").

[6] The legal authority cited by the Commissioner is factually inapposite as those cases found that any omissions of certain alleged impairments at step two were harmless because the ALJ still considered those conditions in other portions of the analysis. Def. Mem. at 14–15; *see Reices-Colon*, 523 F. App'x at 798 (harmless error where ALJ excluded alleged impairments from his review at step two but specifically considered them during subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) ("the ALJ's decision makes clear that he considered the 'combination of impairments' and the combined effect of 'all symptoms' in making his determination").

of Rodriguez's neck and low back pain); *id.* (ALJ summarizing Dr. Revan's observations during a consultative exam of Rodriguez's neck and lower back pain). In fact, the ALJ assigned a sedentary residual functional capacity based specifically on "claimant's obesity, cervical and lumbar degenerative disc disease, and left should arthropathy," but she made no reference to Rodriguez's left Achilles. *Id.* at 27. Notably, the Commissioner failed to provide any citations to the ALJ's decision establishing that the ALJ did, in fact, consider the ankle impairment in her RFC determination.

Taken together, the Court cannot conclude based on the record that the ALJ considered Rodriguez's ankle impairment at any stage in her analysis and, accordingly, remand is warranted on this basis. *Duffy v. Comm'r of Soc. Sec.*, No. 17-CV-3560 (GHW) (RWL), 2018 WL 4376414, at *14 (S.D.N.Y. Aug. 24, 2018) (remand warranted where ALJ did not address alleged ADHD at any step of analysis), *adopted by* 2018 WL 4373997 (Sept. 13, 2018); *Cintron v. Berryhill*, No. 16-CV-7731 (SDA), 2018 WL 1229731, at *10 (S.D.N.Y. Mar. 6, 2018) (remand appropriate where ALJ failed to discuss non-severe impairment in determining RFC); *Hernandez*, 814 F. Supp. 2d at 168 (failure to consider effects of plaintiff's combined impairments in five-step analysis requires remand) (citing *Burgin*, 348 F. App'x at 648–49).

## 2. The ALJ Improperly Evaluated Whether Rodriguez's Impairments Satisfy Listing 1.04(A)

At step three, the ALJ determined that Rodriguez's condition did not meet or equal the listed impairment found in Listing 1.04A because "there is no evidence of

sensory or reflex loss, or nerve root compression." AR at 23. Rodriguez argues that

the ALJ erred in making this finding because Rodriguez did, in fact, have a nerve

root compression, although it is described in the record as an "*impingement* of

exiting right L5 nerve root." Pl. Mem. at 10 (citing AR at 332). He also claims that

the other requirements under Listing 1.04A are satisfied. *Id.* In response, the

Commissioner appears to concede that Rodriguez may have had a nerve root

compression, but contends that the record does not establish the other requirements

to satisfy Listing 1.04. Def. Mem. 15–16.

> Under Listing 1.04A, a claimant must demonstrate:
>
> Disorders of the spine . . . resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, § 104A. The claimant has the burden to

prove that his disability met "*all* of the specified medical criteria." *Otts v. Comm'r*

*of Soc. Sec.*, 249 F. App'x 887, 888 (2d Cir. 2007). "An impairment that manifests

only some of those criteria, no matter how severely, does not qualify." *Norman v.*

*Astrue*, 912 F. Supp. 2d 33, 77 (S.D.N.Y. 2012) (citing *Sullivan v. Zebley*, 493 U.S.

521, 531 (1990)).

In determining whether a claimant meets or equals one of the Listings at

step three, the ALJ must set forth a "specific rationale" in support of her

conclusion. *McHugh v. Astrue*, No. 11-CV-578 (MAT), 2013 WL 4015093, at *6–7 (W.D.N.Y. Aug. 6, 2013) (quoting *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982)). This legal standard requires that the decision contain more than "a brief, conclusory statement" that the claimant fails to meet any of the Listings. *Id.* at *6. Nonetheless, the failure to provide a "specific rationale" is not necessarily fatal as long as the "ALJ's disability determination can be 'reasonably inferred' based on 'substantial evidence' contained elsewhere in the opinion." *Id.* at *7 (quoting *Berry*, 675 F.2d at 468–69).

Here, the ALJ erred in determining that Rodriguez's condition did not satisfy Listing 1.04A based on the lack of evidence of nerve root compression and reflex loss. As for the first element of Listing 1.04A, the record contains evidence that Rodriguez suffered "a nerve root compression characterized by neuro-anatomic distribution of pain." Specifically, on February 8, 2016, Dr. Boadu found a "[l]arge right paracentral disc herniation causing central canal stenosis and severe right foraminal stenosis with impingement of exiting right L5 nerve root" based on a review of Rodriguez's MRI results. AR at 332. As a result, Rodriguez underwent "decompressive laminectomies at L4, L5, and S1" on February 23, 2016. *Id.* at 323. Moreover, Rodriguez made numerous complaints about numbness and pain radiating to his extremities, *see, e.g., id.* at 613 (reporting lower back pain that radiates into his left leg); *id.* at 857 (complaining of neck pain that radiated through left arm to left hand); *id.* at 329 (intermittent numbness in both hands), which is sufficient to show a neuro-anatomic distribution of pain. *See, e.g., Norman*, 912 F.

Supp. 2d at 78 (finding evidence of neuro-anatomic distribution of pain based on plaintiff's complaints of radiating pain and numbness).

Contrary to the ALJ's finding with respect to the third requirement under Listing 1.04A—"motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss"—there is evidence that Rodriguez had sensory or reflex loss.[7]  For example, notes from a neurological examination administered to Rodriguez on February 8, 2016 establish a near-absence of his right and left patellar, or knee-jerk, reflexes (graded 0+/4) and left Achilles (0+/4).  *Id.* at 331.  The rest of his reflexes were assigned a score of 1+/4.  *Id.*  Because the ALJ simply concluded that there is "no evidence of sensory or reflex loss" and failed to credit this evidence, or explain why she did not give it any weight, remand is warranted on this basis as well.  *See, e.g.*, *Millett v. Berryhill*, No. 17-CV-7295 (PGG) (HBP), 2019 WL 1856298, at *2 (S.D.N.Y. Apr. 25, 2019).

The Commissioner contends that remand is not warranted because, even if there is evidence of sensory or reflex loss, Rodriguez failed to establish the "atrophy" element of this third criterion under Listing 1.04A.  Def. Mem. at 15.  This argument is without merit.  As an initial matter, "Listing 1.04A indicates that motor loss can be either 'atrophy with associated muscle weakness <u>or</u> muscle

---

[7] Neither the ALJ nor the Commissioner contested that Rodriguez did not demonstrate the second criterion—limitation of motion of the spine—and the Court finds that there is substantial evidence in the record establishing limited range of motion.  *See e.g.*, *id.* at 426 (On August 12, 2016, Dr. Gopal found decreased lumbar range of motion with pain on extremes of motion.); *id.* at 771–72 (In June 2018, Dr. Gopal noted limited lumbar spine range of motion due to pain and stiffness.).

weakness.'" *Duran v. Colvin*, No. 14-CV-8677 (HBP), 2016 WL 5369481, at \*17

(S.D.N.Y. Sept. 26, 2016) (emphasis added) (quoting 20 C.F.R. Pt. 404, Subpt. P,

App. 1, § 1.04A).  Accordingly, while the Commissioner may be correct that the

record did not show the required evidence of atrophy, Def. Mem. at 15, Rodriguez

may still qualify for Listing 1.04A as the record contains evidence of muscle

weakness, *see, e.g.*, AR at 420 (Rodriguez reporting low back and leg weakness on

October 4, 2016); *id.* at 618 (Rodriguez experiencing "mild lower back pain with

greater weakness present" in December 2017).  The record also contains evidence of

reduced muscle strength in his back and abdominals.  *See, e.g.*, *id.* at 438

(abdominal motor strength graded 4-/5); *id.* at 454 (lumbar paraspinals motor

strength graded 4-/5), 468 (back motor strength rated 4-/5); *id.* at 624 (motor

strength graded 3+/5 for abdominals and 3/5 for lumbar paraspinals).  "Such

evidence is not overwhelming, but it is non-trivial evidence that plaintiff suffered

from significant motor loss."  *Ryan v. Astrue*, 5 F. Supp. 3d 493, 508 (S.D.N.Y. 2014).

It may be that there is conflicting or insufficient evidence to establish that

Rodriguez's impairments qualify under Listing 1.04A, but it is the obligation of the

ALJ to evaluate conflicting evidence and make that determination, not the Court.

*See id.* (Commissioner's proffering of evidence to show claimant did not qualify

under Listings, including that there is "no evidence of muscle atrophy," is for ALJ

"to explicitly reconcile"); *see also Cherico v. Colvin*, No. 12-CV-5734 (MHD), 2014

WL 3939036, at \*28 (S.D.N.Y. Aug. 7, 2014) (remand warranted where record

supports criteria under Listing 1.04 but ALJ failed to address evidence).

As for the fourth requirement under Listing 1.04A, the record reflects conflicting straight leg tests. For example, Dr. Boadu reported a positive straight leg raise on February 8, 2016 and Dr. Revan reported a positive straight leg raise in a seated position on December 13, 2016. AR at 331, 415. However, as the Commissioner points out, examination notes from 2016 through 2017 indicate several negative straight leg raises. *See, e.g.*, *id.* at 431 (July 28, 2016), 476 (July 26, 2016); 629 (May 17, 2017). The ALJ, however, failed to evaluate this conflicting evidence and evaluate whether Rodriguez met this medical criterion.

"Because the ALJ failed to fully address the medical evidence that potentially meets the listing requirements, [the Court] cannot conclude that there is 'sufficient uncontradicted evidence in the record to provide substantial evidence for the conclusion that [p]laintiff failed to meet step three.'" *Duran*, 2016 WL 5369481, at *17 (citing *Sava v. Astrue*, 06-CV-3386 (KMK) (GAY), 2010 WL 3219311 at *4 (S.D.N.Y. Aug. 10, 2010)). If the ALJ finds that Rodriguez's impairments do not qualify under Listing 1.04A on remand, she should provide sufficient specificity to allow the reviewing court to evaluate her determination.[8]

### 3. The ALJ Properly Relied Upon the Vocational Expert's Testimony

"At Step Five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform . . . [and] may

---

[8] Although the Commissioner argues that Rodriguez has not challenged the RFC determination, the Court stops short of evaluating this issue given that the ALJ's failures at steps two and three may impact the subsequent steps—including the RFC determination—in her analysis.

make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). Here, the ALJ relied on vocational expert Mary D. Anderson's testimony that 208,177 year-round jobs were available as an election clerk, and 18,454 jobs were available as a surveillance system monitor. AR at 30; *see id.* at 74–75. Rodriguez argues that the ALJ improperly relied on the VE because (1) the election clerk job is a temporary position during elections, and not a full-time, year-round job per the Dictionary of Occupational Titles ("DOT"); and (2) there is no more than 10,290 jobs available as a surveillance system monitor job. Pl. Mem. at 10–11.

With respect to the election clerk job, the DOT describes the position as follows:

> Performs any combination of the following duties during elections: Compiles and verifies voter lists from official registration records. Requests identification of voters at polling place. Obtains signatures and records names of voters to prevent voting of unauthorized persons. Distributes ballots to voters and answers questions concerning voting procedure. Counts valid ballots and prepares official reports of election results.

U.S. Dep't of Labor, Dictionary of Occupational Titles (DICOT), 205.367-030, 1991 WL 671719. Although the DOT description refers to responsibilities performed "during elections," Rodriguez has not provided any additional evidence to demonstrate that the job itself is seasonal. Moreover, during the hearing, the ALJ recognized that some election clerk jobs may be seasonal and specifically sought clarification from the vocational expert about the number of full-time jobs. *Id.* at

40

75.  In response, Anderson testified that 208,177 out of a total of 294,922 election

clerk jobs were, in fact, year-round positions.  *Id.* at 73–74.  Accordingly,

Rodriguez's reliance on his own interpretation of the DOT description of election

clerk jobs, without more, is insufficient to establish that the 208,177 election clerk

jobs are temporary.  *See, e.g.*, *Doty v. Comm'r*, No. 1:16-CV-1276 (GTS), 2017 WL

4621630, at *10 (N.D.N.Y. Oct. 13, 2017) (rejecting claimant's own interpretation of

election clerk jobs as sporadic based on DOT description where claimant provided

no persuasive evidence).  Because there are approximately 208,177 election clerk

jobs, which as Rodriguez concedes is a significant number of jobs, *see* Pl. Mem. at

11, the ALJ did not err at step five.  *See, e.g.*, *Bavaro v. Astrue*, 413 F. App'x 382,

384 (2d Cir. 2011) ("The Commissioner need show only one job existing in the

national economy that [the claimant] can perform.").

        As for the surveillance system monitor job, Rodriguez's claim that "this job is

grouped with Gambling Monitor . . . for a total combined number of jobs available of

10,290" is unpersuasive.  While Rodriguez cites the Bureau of Labor Statistics to

demonstrate that there are approximately 10,000 gambling monitor jobs, he fails to

provide any evidence that the number of jobs as a gambling monitor and as a

surveillance system monitor have been grouped together.  Pl. Mem. at 11.  To the

contrary, and as the Commissioner points out, there are different occupational codes

for each job, which suggests that the jobs should, in fact, not be grouped together.

*See* Def. Mem. at 20; 379.367-101 Surveillance-System Monitor, DICOT 379.367-

41

010, 1991 WL 673244 (4th ed. 1991); 343.367-014 Gambling Monitor, DICOT 343.367-014, 1991 WL 672854 (4th ed. 1991).

Accordingly, Rodriguez's argument is without merit and remand is not warranted on this ground.

## III.   CONCLUSION

For the foregoing reasons, Rodriguez's motion for judgment on the pleadings is granted, and the Commissioner's cross-motion is denied, and the case is remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g).  On remand, the ALJ should:

(1) Make a finding as to whether Rodriguez's left ankle impairment is severe under step two of the analysis.  Whether or not the ALJ finds it to be severe, the ALJ should include it throughout the remaining steps of the analysis (including posing any limitations that result from the impairment to a vocational expert);

(2)  Re-evaluate whether Rodriguez's impairments satisfy Listing 1.04A, and, *inter alia*, whether Rodriguez qualifies for this Listing given the record with respect to his muscle weakness; and

(3) Re-evaluate the conflicting evidence regarding leg raises and the impact that has on the Listing 1.04A issue.

The Clerk of Court is directed to close docket entries 12 and 16, marking docket entry 12 as granted and docket entry 16 as denied, and to enter judgment in favor of Rodriguez.

**SO ORDERED.**

Dated: February 25, 2021
     New York, New York

JAMES L. COTT
United States Magistrate Judge